FILED

03/08/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2021

**JAYSON BRYANT COLLIER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**Nos. 63CC-2016-CR-843, 63CC-2016-CR-986      William R. Goodman III, Judge**
_____

**No. M2021-00209-CCA-R3-PC**
_____

The Petitioner, Jayson Bryant Collier, appeals the denial of his petition for post-conviction relief from his convictions for possession of one-half ounce or more of marijuana with the intent to sell or deliver within 1000 feet of a school, possession of a firearm with the intent to go armed during the commission of a dangerous felony, theft of property valued at five hundred dollars or less, unlawful possession of drug paraphernalia, driving on a revoked license, and speeding. On appeal, he argues that he received ineffective assistance of counsel, that his sentence violates the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution, and that his sentence is illegal under Tennessee Rule of Criminal Procedure 36.1. After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Taylor R. Dahl, Clarksville, Tennessee, for the Appellant, Jayson Bryant Collier.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; John W. Carney Jr., District Attorney General; and C. Daniel Brollier Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Factual Background.** In 2016, the Petitioner was indicted in case number 63CC-2016-CR-843 for possession of one-half ounce or more of marijuana with the intent to sell or deliver within 1000 feet of a school, possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony, theft of property valued at more than five hundred dollars, and unlawful possession of drug paraphernalia. The

Petitioner was also indicted in case number 63CC-2016-CR-986 for driving while his license was cancelled, suspended, or revoked and for speeding. The Petitioner was tried for the charges in case number 63CC-2016-CR-843 and case number 63CC-2016-CR-986 at the same time.

At the Petitioner's trial, Officer Ronald Myers of the Clarksville Police Department testified that on the morning of Wednesday, March 9, 2016, he was sitting in his patrol car at Cunningham Lane, which is in a school zone, in Clarksville. He stated that it was around 7:48 a.m. and he was "running radar" when he stopped the Petitioner for driving thirty-two miles per hour in a twenty mile-per-hour zone. At the time, the school zone lights were flashing, and people were coming and going from the two schools. Officer Myers said that when he activated his emergency lights, the Petitioner stopped on "the gravel parking lot right before the digital school sign" of Minglewood Elementary School. He approached the Petitioner's car, informed the Petitioner and the woman with him that he had stopped the Petitioner for speeding, and asked the Petitioner for his license and registration. Officer Myers observed the smell of marijuana coming from the Petitioner's car, and when he asked the Petitioner about it, the Petitioner admitted that he had smoked marijuana in the car one hour earlier and that he had about an ounce of marijuana in his vehicle. After running the Petitioner's license number through the law enforcement database, he discovered that the Petitioner's license was revoked. Officer Myers conducted a search of the Petitioner's car, which revealed a Mason jar full of a substance appearing to be marijuana that was separated into several bags, a digital scale, a substantial amount of cash that had been shoved underneath the driver's seat, 140 sandwich bags inside a backpack in the backseat, some cigarillos, and a loaded handgun. Upon running the gun's serial number through the database, he discovered that the gun was stolen. The Petitioner asserted that he did not know the gun was stolen and that the money under the seat belonged to his girlfriend. Officer Myers acknowledged that the location of the Petitioner's stop was the largest school zone in Clarksville because it had it had two school zones back-to-back.

Lon Chaney, a narcotics investigator with the Clarksville Police Department, testified that the Petitioner admitted that the gun and the marijuana found in his car belonged to him. He said that he field tested the substance in the larger bag, which tested positive for marijuana, but did not field test the substance in the two smaller bags because they contained material similar to the material in the larger bag. Investigator Chaney said the combined weight of all three bags was 32 grams and that the combined street value of the marijuana found in the Petitioner's car was approximately $375. He said the Petitioner initially told him he got the gun a year prior, which was impossible based on the police report for the stolen gun. Investigator Chaney said that the cash found in the Petitioner's vehicle totaled $2000 and was in mostly twenty dollars bills, although there were a few five and ten dollar bills as well. He said the Petitioner initially told him that the recovered cash belonged to his girlfriend and that he had deposited it into a bank account and recently

withdrawn it. The Petitioner then told him that the cash belonged to him and his girlfriend together and then later said that the cash was payment for his labor at his mother's lawn care service. Investigator Chaney noted that a Regions bank deposit for $2000 had been found in the Petitioner's car. He explained that sandwich bags, like the ones found in the Petitioner's car, were "often used for resale, where [people] break off portions of your larger amount[] of drugs" and "put them in smaller baggies for resale." Investigator Chaney asserted that the number of sandwich bags, along with the other items found in the car, showed the Petitioner's intent to sell the marijuana.

Officer Bill Van Beber, a fatal crash investigator with the Clarksville Police Department, testified that he was asked to measure some distances relevant to the Petitioner's case. Officer Van Beber stated that the location where the Petitioner's car was stopped was inside the property line for Minglewood Elementary School, meaning that the Petitioner was stopped on school property. In addition, he said that the spot where the Petitioner was first verified as speeding was 75 feet from the building of the Providence Middle School.

Special Agent William Stanton, a forensic scientist with the Tennessee Bureau of Investigation, testified that his testing determined that one of the bags recovered from the Petitioner's car contained 27.27 grams of marijuana. As relevant to the Petitioner's charged marijuana offense, he explained that one-half ounce is equal to 14.175 grams. Agent Stanton said that the two other bags recovered from the Petitioner's car weighed 6.92 grams; however, he did not analyze the material in those bags because it was under the threshold weight set by the laboratory.

Latisha Collier, the Petitioner's mother, testified that Arthur Hill, her fiancé of five years, had given the Petitioner a check for $2000 on March 8, 2016, to cover his car payment and other bills.

Arthur Hill testified that he had written the Petitioner a $2000 check to pay for the Petitioner's car note the day before the Petitioner's arrest. A carbon copy of this check was admitted into evidence at trial. Hill explained that he was a cosigner on the loan for the Petitioner's car and that the Petitioner was five months behind on his car payment.

Kelsey Campbell, the Petitioner's girlfriend, testified that she was with the Petitioner when he was stopped and arrested on March 9, 2016. Campbell denied that the Petitioner sold marijuana and denied that the Petitioner was selling marijuana in March 2016. She stated that she smoked two or three grams of marijuana every day, that the Petitioner smoked slightly more than that each day, and that the two of them smoked approximately one ounce of marijuana a week. Campbell said that the night before the Petitioner was stopped in this case, they bought an ounce of marijuana that they intended

to split. She asserted that the sandwich bags were in the car so that she and the Petitioner could divide up the marijuana they had purchased and that they had the digital scale to check the amount of marijuana they were buying and to split it between them. She also said that the $2000 in cash recovered from the car was money from tips that the Petitioner was holding for her because she did not have a bank account. Campbell denied that she and the Petitioner intended to sell the marijuana at the schools near the location of the stop. She said that although the Petitioner claimed that all of the marijuana belonged to him, in reality, half an ounce of it belonged to her, and half an ounce belonged to him. Campbell admitted that when the Petitioner was arrested, she lied to Investigator Chaney when she told him the phone belonged to her so he would allow her to take it. She also admitted that she deleted everything from this phone but claimed that she did so because she had "personal videos" on it that she did not want the police to see.

The Petitioner testified at trial that he was currently twenty-four years old but had been twenty-three years old at the time of his arrest. He said the night before his arrest, he had spent the night with his girlfriend Kelsey Campbell, and they were "headed to pay some bills[,]" including his car payment, when he was stopped. He acknowledged that he was driving over the speed limit prior to his stop and claimed that he had not seen the sign flashing for the school zone that day. The Petitioner said he knew he was in a school zone when he was stopped; however, he denied that he planned to sell marijuana to school children that day. He also denied intending to sell the marijuana at all and claimed that the marijuana in his car was for personal use.

The Petitioner admitted that he had smoked marijuana that morning in his car prior to being stopped. He said that he had purchased an ounce of marijuana the day before his arrest for $280 or $290 and that he had bought this marijuana for him and his girlfriend to share. He stated that he told the police that all of the marijuana belonged to him because he was trying to protect his girlfriend.

The Petitioner admitted that he had misled the police when he explained where he had gotten his gun. He maintained that he had borrowed money from Arthur Hill the day before to get caught up on his bills, specifically his car payment. However, the Petitioner said that the cash in his car belonged to his Kelsey Campbell. He said that Campbell had earned this money at her job at Kelly's Big Burger and that he was just holding this money for her because she did not have a bank account. The Petitioner asserted that at the time they were pulled over, he and Campbell were counting the money, and he "got scared." He maintained that the scale was for weighing the marijuana that he purchased and that the sandwich bags were for dividing up the marijuana with his girlfriend and for storing their marijuana. The Petitioner stated that he had the handgun "for protection."

- 4 -

The Petitioner denied that he was a drug dealer and denied that he ever planned to sell drugs to the children at Minglewood Elementary School that morning. He also denied that he planned to sell drugs within 1000 feet of a school that morning. He admitted that his drivers license was revoked but denied knowing that his gun was stolen. The Petitioner acknowledged that when Campbell informed him that she had erased all of the messages and calls on his phone, he told her, "You did good, babe."

At the conclusion of this trial, the jury found the Petitioner guilty of possession of one-half ounce or more of marijuana with the intent to sell or deliver within 1000 feet of a school, possession of a firearm with the intent to go armed during the commission of a dangerous felony, theft of property valued at five hundred dollars or less, unlawful possession of drug paraphernalia, driving on a revoked license, and speeding. The Petitioner failed to appear at his sentencing hearing for these convictions and was later apprehended.

Thereafter, the Petitioner was sentenced in case number 63CC-2016-CR-843, by agreement of the parties, in Count 1 to two years at one hundred percent for the conviction for possession of one-half ounce or more of marijuana with the intent to sell or deliver within 1000 feet of a school; in Count 2 to three years at one hundred percent for the conviction for possession of a firearm with the intent to go armed during the commission of a dangerous felony, served consecutively to the sentence in Count 1; in Count 3 to eleven months and twenty-nine days for the conviction for theft of property valued at five hundred dollars or less, served concurrently with the sentence in Count 2; in Count 4 to eleven months and twenty-nine days for the conviction for unlawful possession of drug paraphernalia, served concurrently with the sentence in Count 2. In case number 63CC-2016-CR-986, the Petitioner was sentenced by agreement of the parties in Count 1 to six months, served concurrently to Count 2 in case number 63CC-2016-CR-843, for the driving on a revoked license conviction and was given only a fine for the speeding conviction in Count 2.

Following the Petitioner's convictions in this case, trial counsel was allowed to withdraw, and counsel was appointed to represent the Petitioner on appeal. Thereafter, the Petitioner timely filed a motion for new trial. Because of a conflict, new appellate counsel was appointed to proceed with the Petitioner's appeal. However, on February 13, 2019, the Petitioner, with the help of appellate counsel, voluntarily dismissed his motion for new trial and waived all rights to appeal.[1]

---

[1] In furtherance of his desire to dismiss his appeal, the Petitioner signed an affidavit, which stated in pertinent part:

"I have decided not to pursue my appeal in this matter; After reviewing my sentence and of my own volition [I] have made this decision on my own; I have instructed my attorney

On October 1, 2019, the Petitioner filed a pro se "Petition for Relief From Conviction or Sentence," generally asserting that he received ineffective assistance of counsel. On November 13, 2019, the Petitioner was appointed post-conviction counsel.

On July 15, 2020, the Petitioner, citing Tennessee Rule of Criminal Procedure 36.1, filed a pro se "Motion to Correct Illegal Sentence," arguing in pertinent part that his convictions and sentences were void or voidable because they violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 8, 9 and 16 of the Tennessee Constitution and that his five-year sentence for his non-violent drug offense directly contravened Tennessee Code Annotated sections 39-17-417 and 39-17-432.

On November 20, 2020, with the assistance of appointed counsel, the Petitioner filed an amended petition for post-conviction relief. In this amended petition, the Petitioner incorporated the grounds for relief he alleged in the original petition and additionally argued, in pertinent part, that (1) his sentence was in violation of the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution because he was entitled to retroactive application of the amendment to Code section 39-17-432, which reduced the drug-free school zone from 1000 feet of a school to 500 feet of a school and removed the mandatory service of a minimum sentence; (2) trial counsel provided ineffective assistance in failing to file any pretrial motions, including a motion to suppress his statements to law enforcement; in failing to request funding for an expert to evaluate whether the Petitioner's statement to law enforcement was voluntary and knowing given that he was under the influence of marijuana when he gave his statement; and in failing to communicate properly with him, especially regarding the State's offer; and (3) appellate counsel provided ineffective assistance in failing to preserve issues on appeal.

At the post-conviction hearing, the post-conviction court recognized that this hearing concerned not only the petition for post-conviction relief but also the Petitioner's pro se motion to correct an illegal judgment pursuant to Rule 36.1. Thereafter, appellate counsel testified that he was appointed to represent the Petitioner "solely on appeal" after the Petitioner had been convicted and sentenced and a motion for new trial had been filed. He stated that he been involved in 500 to 1000 appeals, had represented clients in seventy-five appeals that resulted in published opinions, and had handled cases before the United States Supreme Court, the Federal Court of Appeals, Military Courts, and state court.

---

to dismiss the appeal in this matter; I understand that by dismissing this appeal, I will be barred from filing an appeal in this matter in the future . . . ."

Appellate counsel said that on February 6, 2019, he received a notarized letter from the Petitioner, stating that "the primary issue was [his] sentence" and that "if he came to court he would lose his job at the prison" and "would lose some work credits," and that "upon weighing everything[,]" he had decided he wanted to "dismiss the appeal." Appellate counsel stated that he had the Petitioner sign an affidavit on February 13, 2019, which specified that the Petitioner understood that if he dismissed his motion for new trial, it would "kill his appeal." He noted that the Petitioner's February 6, 2019 letter came "out of the blue" and that he had the Petitioner sign the affidavit after discussing the issue with him to ensure that the Petitioner "understood what he was doing[.]" He said that after the Petitioner signed this affidavit, he dismissed the Petitioner's appeal. Appellate counsel stated that he believed the Petitioner understood the consequences of dismissing his appeal. He said that the Petitioner made the decision to dismiss his appeal voluntarily and that he did not force him or ask him to dismiss his appeal. He asserted that the Petitioner's letter to him was "attached to the motion to dismiss" that was filed on February 12, 2019, and that the Petitioner's affidavit was filed on February 13, 2019.

Appellate counsel asserted that most of the conversations with the Petitioner took place over the phone or by mail, although he "presume[d]" that since he "notarized . . . the affidavit" the Petitioner signed, he and the Petitioner had a "face-to-face" conversation that day. He said the Petitioner's main issue appeared to be his sentence, although he acknowledged that he had not yet received the transcripts from the trial and sentencing hearing that the trial court had ordered. He said he told the Petitioner that if the Petitioner waived his appeal, he could not appeal his sentence. Appellate counsel noted that section five of the February 13, 2019 affidavit, which was signed by the Petitioner, specifically stated, "I understand that by dismissing this appeal I will be barred from filing an appeal in this matter in the future" Appellate counsel said the reason the Petitioner wanted to dismiss his appeal was because "he wanted to keep whatever job he had at the prison and not lose credits." When asked if he and the Petitioner ever discussed whether he believed his sentence would only be served at thirty percent, appellate counsel replied,

> To be honest, I don't remember. I would have looked at the paperwork and stuff. But as I say, we were waiting for transcripts.
>
> And most of what I do on appeal, since it's kind of like looking at a photograph, I'm stuck with whatever has happened. You generally wait until the photographs develop, which [in this case] would be transcripts.

Appellate counsel was also asked if he recalled any discussions with the Petitioner about the school zone enhancement to a one hundred percent sentence or the weapons charge being a one hundred percent sentence, and appellate counsel replied, "The only part of the recollection I have with that, the sentencing had already been done, so that should

have been a known factor, because sentencing had already been done before I came on." When asked if he knew of any case law indicating that there was some question regarding the constitutionality of the drug-free school zone enhancement law, appellate counsel replied, "the school zone enhancement issues had been litigated fairly extensively, including I've had some appeals. The Court is pretty clear. I think it's a nasty law, but at least at the time, it was fairly cut and dry."

The Petitioner testified that trial counsel provided ineffective assistance by failing to properly communicate with him. Although he acknowledged that trial counsel conveyed a proposed settlement offer of three years to be served at one hundred percent, he asserted that trial counsel never explained that he would be eligible for sentence reductions. He said trial counsel told him he would have to serve the three year sentence "day-for-day" with "no good time" credits and "nothing coming off." The Petitioner said he later learned, after reviewing the statute, that he would be eligible for up to a fifteen percent sentence reduction. He said that if he had known about this fifteen percent sentence reduction, he "would have taken the plea."

The Petitioner also asserted that when he provided a statement to police, he was under the influence of marijuana, which he had been smoking at the time he was stopped. He admitted that he did not tell the officer he was under the influence of marijuana when he gave his statement, but he could not recall whether the officer specifically asked him if he was under the influence of any drugs. The Petitioner stated that when he gave his statement, he "wasn't paying attention" because he was "high." He added that he went "back-and-forth" and tried to "recant certain statements" because he was impaired from the marijuana and did not know what he was doing. The Petitioner said he never told trial counsel that he was under the influence of drugs at the time he gave his statement to police. He stated that trial counsel reviewed the videotape of his interview, but they never discussed his impairment during his statement. The Petitioner asserted that trial counsel never filed a motion to suppress his statement to police and that trial counsel never had an expert review his videotaped interview to determine whether he was impaired at the time of his statement.

The Petitioner noted that in addition to the post-conviction petition, he also filed a motion to correct an illegal sentence. He said that his sentence for the marijuana charge had been enhanced because he was in a school zone and that he believed the enhancement statute had been changed since his trial. When asked if he would have been in a school zone under the new statute, the Petitioner replied, "I'm not sure, because I—didn't it change to 500 feet? I probably would have been [in a school zone] because it's like the longest school zone in Clarksville. But I think I would have, but not like on the actual property. I'm not sure, though." The Petitioner asserted that the amended enhancement statute placed a burden on the State to prove that the defendant was actually in the school

zone selling drugs. He also claimed that because he was merely speeding with marijuana in his vehicle at the time of his stop rather than actually selling drugs in the school zone, his sentence would not have been enhanced under the amended enhancement statute. The Petitioner asserted that the sentence he was serving was now illegal because of the amendment to Code section 39-17-432.

The Petitioner stated that under the 2020 amended statute, he would not have received the same sentence that he received under the statute as it existed at the time of his offense. However, he admitted that he was not claiming his sentence was illegal at the time it was given. The Petitioner said that his main issue on post-conviction was that he did not understand the plea negotiations and that if he had understood them, he would have accepted the State's offer of three years, which was better than the sentence of five years that he received after being convicted at trial.

The Petitioner acknowledged that the road that he was travelling on prior to his stop was actually the road on which the school was located. He also admitted that the location of his stop was on school property. When he was asked whether he was easily within 500 feet of the school property, the Petitioner responded that his location when the officer first put on his lights on was "way before that."

The Petitioner admitted that Investigator Chaney had not coerced him into giving his statement; instead the issue was that he "wasn't thinking right" when he gave his statement because he had just smoked marijuana. He acknowledged that he was not under the influence of any drugs other than marijuana at the time of his statement. The Petitioner said that when he and trial counsel were going over the facts of the case, which included the police finding several rolled joints in his car, trial counsel had asked him if he was under the influence at the time, and he thought he had told him he was under the influence of marijuana, although they did not have an in depth discussion about it.

The Petitioner said that he remembered "[m]ost" of his interview and that he was "pretty sure" he remembered his interview before his trial. He acknowledged that he and trial counsel reviewed his interview and trial counsel talked to him about the contents of his interview. The Petitioner admitted he said things during his interview that were not true and claimed he "recanted" statements because he was "under the influence." He claimed that Investigator Chaney should have known he was impaired at the time of the interview because of the appearance of his "eyes" and because his "speech wasn't clear" and he "mumbled." He said that he had smoked two or three joints of marijuana the morning of his stop, that he had been smoking a joint at the time of his stop, and that this marijuana use had caused him to speed that day. The Petitioner admitted that he smoked marijuana on a regular basis at the time of his stop and that it was not unusual for him to smoke two or three joints before driving. When he was asked whether smoking marijuana

affected his ability to function, the Petitioner said he would not smoke marijuana if he had something important to do or had to work.  He said that if he went places after he smoked marijuana, people could usually tell that he was "high" because of the way he looked.

The Petitioner said that when trial counsel informed him of the State's offer of three years at one hundred percent, and he was "really shocked" about the plea.  He asked trial counsel if there was any way to reduce the sentence, and trial counsel told him, "No . . . that's final.  That's what it is."  The Petitioner said that after that, there were no more attempts to negotiate the State's offer.  He also said that there was "only one" settlement offer conveyed to him by trial counsel.

The Petitioner asserted that trial counsel asked him at trial if he was under the influence of marijuana at the time he was pulled over.  He reiterated that he was smoking marijuana at the time of the stop and that the officer said he could see the smoke coming from his vehicle.  The Petitioner confirmed that after his arrest he was transported directly to the police station to give his statement.

Trial counsel testified that he represented the Petitioner at trial and that he and the Petitioner discussed the plea negotiations during his case.  When asked about the State's offer and whether he discussed this offer with the Petitioner, trial counsel stated:

> My recollection of the offer was three [years] at 100 [percent] and then another two [years] on probation, after he served the three.  That was the offer I got from the State and that's what I discussed with him. . . .

> And we had extensive discussions about whether or not that was a legal sentence.  Because legally speaking, the three years is mandatorily consecutive to the two years, because that's the marijuana charge.  But he had to serve a sentence on it too.

> And it was his first felony conviction, is my recollection of it[,] too.  He didn't understand why he should have to serve a prison sentence [the] first time he ever got convicted of a felon[y], and [he] refused to do so.

When trial counsel was asked whether he told the Petitioner that he could only serve eighty-five percent of the one hundred percent sentence, he said,

> We never got that far.  He refused to serve a prison sentence for the crimes he was charged with.  He wasn't—like, that wasn't even an option for him. . . . .  He's not going to serve a jail sentence.  That's his attitude; I'm not going to serve a jail sentence the first time I've ever been convicted of

[a] felony. This is an excessive punishment for the crimes I was charged with; is his attitude.

So it never got to the point where . . . my recollection of it, we never discussed good time credits or anything like that, because once he heard prison sentence he was checked out.

Trial counsel said that the Petitioner "was an everyday smoker" who was "high every time" he saw him. He said he was "pretty sure" the Petitioner told him he was smoking marijuana when he got stopped. Trial counsel acknowledged that they never discussed whether the Petitioner's smoking marijuana would have affected his statement to police; however, trial counsel asserted that being "high" was the Petitioner's "everyday state." He added, "[W]hen you're high all the time, it doesn't affect your judgment." He also said he did not remember the Petitioner confessing to anything during the interview. He insisted that "there was no, 'I sell weed for money,' confession" although there were "some inconsistencies, obviously"

Trial counsel noted that the police recovered receipts detailing the source of the money in the Petitioner's car. He asserted, "[W]here the money came from was probably the bigger issue, and . . . that was mostly what the [Petitioner's] lies were about, I guess, in the interview, if there were any lies." He added that the Petitioner's mother was "willing to produce evidence and testify that the lies were true" and that the Petitioner's mother testified along those lines at trial.

Trial counsel said he never really considered filing a motion to suppress the Petitioner's statement because he "didn't feel like it would be successful" As to whether he considered having the Petitioner's interview evaluated by an expert to determine whether he was impaired, trial counsel said he did not consider it because the Petitioner "couldn't afford an expert" and rarely came to talk to trial counsel because he owed him money. He noted that the Petitioner "had the perfect constellation of bad facts" because "he was speeding in a school zone with a gun and an ounce of weed" and "the Judge made them count the sandwich baggies[,]" which did not help his case.

Trial counsel stated that although the Petitioner was always "high" when he came to his office to discuss his case, the Petitioner was a "very intelligent person" who "understood clearly" what they were discussing about his case. He said that when the Petitioner's bond was not revoked after being convicted, the Petitioner disappeared for six months because "he knew" he should have been imprisoned immediately upon being convicted.

Trial counsel said the State was adamant that the Petitioner serve three years in the offer because the Petitioner was serving a sentence on probation when he was charged in this case. He stated that he did not recall the State making an offer of just three years to serve without requiring the Petitioner to serve an additional two years on probation.

Trial counsel identified emails between the State and him wherein he attempted to negotiate something less than a one hundred percent sentence. He said he unsuccessfully asked for a sentence of three years at forty-five percent with the Petitioner entering a guilty plea to a Class E felony out of range; however, despite his negotiation efforts, the State never agreed to a reduction of its offer of three years at one hundred percent for the weapon charge. Trial counsel asserted that he talked to the Petitioner about his charges and the possible punishments for his charges. He noted that even after the Petitioner was convicted, the State offered him the same deal of three years at one hundred percent followed by two years of probation, but the Petitioner "stopped coming to court."

Trial counsel said he was "sure" he talked to the Petitioner about the fact that he could get out at eighty-five percent on the one hundred percent sentence, but the Petitioner "wasn't willing to plead to the 'D' [felony] at 100 percent. So it never got any further [than] that." He asserted that the Petitioner told him, "I'm not going to do it. I'll take my chances at trial." He added, "For the record, [the Petitioner] would have got[ten] three [years] at 100 percent at trial anyway. Why would he plead to it?"

Sergeant Lon Chaney of the Clarksville Police Department, testified that he had been a narcotics investigator with the department when he interviewed the Petitioner in this case. When he asked if there was anything about the Petitioner's condition at the time of the interview that made him believe the Petitioner did not understand what was happening, Sergeant Chaney said, "No sir. I would have noted that early on[.]" He said that although he sometimes interacted with people who were so highly impaired that they could not be interviewed, he believed the Petitioner understood everything discussed during his interview. He said he routinely asked individuals to recall their address, their cars, and their social security number, and he did not see anything in the Petitioner's responses that raised a red flag that the Petitioner was impaired.

Sergeant Chaney said he knew the Petitioner had been smoking marijuana at the time he was stopped and that six joints of marijuana had been recovered from the Petitioner's car. He said, "I'm disputing . . . [the Petitioner's] level of intoxication. I—I don't dispute that he smoked marijuana a lot." He added,

> [The Petitioner] was not to where he didn't understand, wasn't able to recall or understand the gravity of what was going on. He was able to speak to me intelligently[,] and he was able to come up with different various options of

how this evidence was piled on him.  He was able to come up with ulterior theories, which shows me that he was able to think on his feet, at that time.

On February 8, 2021, the post-conviction court entered a written order denying both the petition for post-conviction relief and the motion to correct an illegal sentence. Regarding the alleged unconstitutionality of the Petitioner's sentence, the court held:

Petitioner contends that the sentence imposed i[s] in violation of the Eight Amendment to the U.S. Constitution and Article I, Section 16 of the Tennessee Constitution, by virtue of being cruel and unusual punishment given the nature of the offense for which Petitioner was convicted.  The issue of the constitutionality of the school zone provisions of T[enn]. C[ode] A[nn]. § 39-17-432, ha[s] previously been considered and upheld, State v. Smith, 48 S.W.3d 159 (Tenn. [Crim. App.] 2000).  In State v. Smith, id[.], the Court cited United States v. Rodriguez, 961 F.2d 1089, 1094 (3d Cir. 1992), in which the court stated:

The mere presence of substantial quantities of drugs increases the risk of gunfire and other violence . . . . In addition, a person possessing drugs may abandon them while fleeing from the police . . . . The drugs may also be lost or stolen near a school and may then find their way into students' hands.

Petitioner argues that the mandatory sentence rendered in the case pursuant to T[enn]. C[ode] A[nn]. § 39-17-432, was arbitrarily imposed and should be deemed as disproportionate to the crime committed.  Based on State v. Smith, id[.] and the cases cited therein[,] this issue is found to be without merit.

Regarding the Petitioner's ineffective assistance of counsel claims, the trial court made the following findings and conclusions:

The trial transcript reflects that Petitioner was advised of his rights under Miranda and that he talked freely with [Sergeant] Chaney.  Petitioner went on to voluntarily state, "It's all mine."  As to his state of intoxication, the proof at trial indicated that Petitioner had smoked some marijuana one hour prior to being stopped and that he smoked marijuana daily.  Trial counsel testified that Petitioner was high or at least had smoked every time that counsel met with Petitioner, that Petitioner seemingly understood the issues in the case, the offer of settlement made by the state and was able to effectively communicate with counsel.  It is recognized that intoxication or mental unsoundness is not alone sufficient to bar the introduction of

- 13 -

statements made by an accused if the evidence also shows the accused was capable of understanding his rights. State v. Green, 613 S.W.2d 229 (Tenn. Cr[im]. App. 1980). There was no proof the Petitioner's use of marijuana prevented him from understanding the fact that he was giving a statement to law enforcement or that he did not understand the significance of the Miranda warnings give to him. . . .

. . . Petitioner makes specific reference to counsel's failure to file a Motion to Suppress[] Petitioner's statement to law enforcement. This court does not find there is a reason to believe that such a motion would have been successful and further that[,] given the proof at trial[,] that the exclusion of Petitioner's statement would have resulted in a different outcome. On this basis this court does not find that either prong of Strickland . . . has been established as to this issue.

Petitioner complains that trial counsel failed to request funding for an expert to evaluate Petitioner's confession to determine whether the Petitioner lacked capacity to make a knowing and voluntary waiver of his right and/or to understand whether his detention was voluntary or involuntary, or to have the capacity to give a statement to law enforcement in his intoxicated state. Petitioner has presented no proof that any expert could have made such an evaluation or what the results would have been from an attempted evaluation. The burden of proof is on the Petitioner to establish by clear and convincing evidence such factual allegations. T[enn]. C[ode] A[nn]. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). As to this issue this court finds that Petitioner has not met the burden of proof.

Petitioner complains that trial counsel failed to . . . explain the State's offer of settlement. Trial counsel testified that he met with Petitioner on several occasions, that trial counsel repeatedly attempted to obtain [a] more advantageous settlement offer from the [S]tate and discussed that one of the most critical issues in the case was the money in the vehicle. Defense counsel cannot force the prosecution to make any settlement offer other than an offer to which the prosecution is agreeable. The testimony in the Post[-]Conviction Hearing[] reflected that the prosecution insisted on the Petitioner serving time in incarceration and that the Petitioner was not agreeable to any offer which required that he be incarcerated, therefore there was no agreement. . . .

Petitioner mentions in his testimony that had he known there would have been a sentence credit of 15% that he would have accepted the offer of

the State, but counsel failed to advise him accordingly. This court notes that the sentence credit is not a guaranteed credit, but must be "earned[,"] therefore[,] the sentence of five (5) years in this case was a 100% sentence. Also, the transcript of the "Sentencing/Plea" reflects that the trial court specifically inquired of the Petitioner if he understood the terms of the sentence, to which Petitioner replied in the affirmative. Therefore, this issue is found to be without merit.

Regarding the Petitioner's "Motion to Correct Illegal Sentence," the trial court held:

> In this case the date alleged in Count 1 of the indictment on which the Petitioner was convicted[] is March 9, 2016, at which time the distance of the school zone was 1,000 feet [of] the real property of a school. Tenn. R. Crim. P. 36.1(a) states:
>
> > (2) For purposes of this rule, an illegal sentence is one that is not authorized by the applicable statutes or that directly contravenes an applicable statute.
>
> Petitioner was charged with violation of . . . T[enn]. C[ode] A[nn]. § 39-17-417[] on March 9, 201[6], and convicted. The subsequent amendment of the statute does [not] present a colorable claim so as to give a basis for finding an illegal sentence has been imposed on the Petitioner.

Following entry of this written order denying relief, the Petitioner timely filed a notice of appeal.

## ANALYSIS

**I.    Ineffective Assistance of Counsel.**    The Petitioner argues that the post-conviction court erred in denying him relief because both trial counsel and appellate trial counsel provided ineffective assistance. Specifically, he asserts that trial counsel was ineffective in failing to file a motion to suppress his statement to law enforcement, which he claims he gave while under the influence of marijuana, and in failing to have an expert examine his recorded interview. He also claims trial counsel was ineffective in failing to properly communicate the State's offer. Finally, he asserts that appellate counsel provided ineffective assistance in failing "to review the sentencing" with him. The State counters that the post-conviction court properly denied relief on these ineffective assistance of counsel claims. We agree with the State.

- 15 -

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The right to effective assistance of counsel is protected by the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). To establish prejudice in the context of a guilty plea, a petitioner must show that, but for counsel's errors, the petitioner would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)). "Because a petitioner must establish both prongs

of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

Regarding the claim that trial counsel was ineffective in failing to file a motion to suppress his statement and in failing to have an expert review his statement, the Petitioner asserts that his convictions were based on "a coerced confession and violation of the privilege against self-incrimination" and that his statement was "given involuntarily and unknowingly since he was under the influence of marijuana." The Petitioner maintains that had his statement "been suppressed after examination by an expert, this would have resulted in a different outcome at trial." At trial, Officer Ronald Myers testified that he stopped the Petitioner and his girlfriend for speeding in a school zone. During the stop, Officer Myers smelled marijuana coming from the Petitioner's car. During the search of the Petitioner's car, he found more than an ounce of marijuana, a digital scale, two thousand dollars of cash, 140 sandwich bags, and a loaded gun that was later found to be stolen. At the post-conviction hearing, the Petitioner never introduced the video recording of his interview with the police.

In addition, the Petitioner never presented testimony from an expert stating his statement was unknowing and involuntary. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). The Petitioner admitted that Sergeant Chaney never coerced him into providing a statement during his interview and acknowledged that his actual claim was his impairment from marijuana at the time of his statement. Trial counsel testified that the Petitioner was "an everyday smoker" who was "high" every time he saw him. He said that although the Petitioner was always under the influence of marijuana when he came to his office, the Petitioner was a "very intelligent person" who "understood clearly" what they were discussing regarding his case. Trial

- 17 -

counsel said he never really considered filing a motion to suppress the Petitioner's statement because he did not believe it would be successful. He also asserted that the Petitioner would not have been able to afford an expert to evaluate his statement because the Petitioner owed trial counsel money for his representation in this case.

Sergeant Lon Chaney testified that although he knew that the Petitioner had been smoking marijuana prior to his stop, the Petitioner was able to speak to him "intelligently" and was able to come up with different explanations for how the evidence came to be in his car. Sergeant Chaney said that although he had interviewed people who were so highly impaired that they could not be properly interviewed, the Petitioner seemed to understood everything they discussed.

In its order denying relief, the post-conviction court concluded that the Petitioner had failed to present any proof that his use of marijuana prevented him from understanding that he was giving a statement or prevented him from understanding the significance of his Miranda warnings. The post-conviction court also held the Petitioner failed to show that a motion to suppress his statement would have been successful or that if his statement had been suppressed, it would have changed the outcome of his trial. The record fully supports the post-conviction court's findings of fact and conclusions on these issues. Because the Petitioner has failed to establish that trial counsel provided ineffective assistance in failing to file a suppression motion or in failing to have an expert review his statement, the Petitioner is not entitled to relief on these claims.

Next, we turn to the Petitioner's claim that trial counsel was ineffective in failing to communicate the State's offer. The Petitioner asserts, mirroring his testimony at the post-conviction hearing, that had trial counsel properly explained his eligibility for sentence reduction credits of fifteen percent on the State's offer of three years at one hundred percent, he would have accepted the offer, which would have been a better result than the five-year sentence he received following his convictions. At the post-conviction hearing, an email was admitted memorializing the State's offer, which detailed that in case number 63CC-2016-CR-843, the Petitioner in Count 1 would enter a guilty plea to possession of marijuana within the intent to sell, without the drug-free school zone enhancement, for a two-year suspended sentence to be served consecutively to the sentence in Count 2; in Count 2, the Petitioner would enter a guilty plea to possession of the handgun during the commission of a dangerous felony and would receive a mandatory three-year sentence at one hundred percent; in Count 3, the Petitioner would enter a guilty plea to theft of the handgun for a two-year suspended sentence, to be served concurrently to the sentence in Count 1; the drug paraphernalia charge in Count 4 would be dismissed; and the charges in case number 63CC-2016-CR-986 would be dismissed. Trial counsel testified that he presented this offer to the Petitioner, but the Petitioner refused to consider any plea deal that required him to be incarcerated for his first felony conviction. Trial counsel said

he was "sure" he talked to the Petitioner about the potential to get released after serving eighty-five percent on the one hundred percent sentence, but the Petitioner was not willing to plead guilty to the Class D felony, "[s]o it never got any further [than] that." He also explained that even after the Petitioner was convicted, the State offered him the same deal of three years at one hundred percent followed by two years of probation, but the Petitioner failed to appear at his sentencing hearing.

In the order denying relief, the post-conviction court found that the fifteen percent sentence reduction was "not a guaranteed credit" and had to be "earned" and that the offer from the State was properly characterized as a one hundred percent sentence. Here, the record clearly shows that the Petitioner refused to accept the State's offer, not because he was not informed of the possibility of a fifteen percent sentence reduction, but because he did not want to serve any time in incarceration for these offenses. Because the Petitioner has failed to show that trial counsel provided ineffective assistance regarding his communication of the State's offer, the Petitioner is also not entitled to relief on this issue.

Finally, we address the Petitioner's claim that appellate counsel was ineffective. The Petitioner asserts that although appellate counsel acknowledged that the Petitioner's main issue was sentencing, he nevertheless voluntarily dismissed the Petitioner's motion for new trial and waived all rights to an appeal, including his sentencing issue. At the post-conviction hearing, appellate counsel testified that he was appointed to represent the Petitioner on appeal after the Petitioner had been convicted and sentenced and the motion for new trial had already been filed. Appellate counsel said that on February 6, 2019, he received a notarized letter from the Petitioner, wherein he stated that his "primary issue was [his] sentence" and that "if he came to court he would lose his job at the prison" and "would lose some work credits" and that after "weighing everything," he had decided he wanted to "dismiss the appeal" Appellate counsel said he discussed this issue with the Petitioner to ensure that he knew what he was doing and then had the Petitioner sign an affidavit on February 13, 2019, which stated that the Petitioner understood that if he dismissed the motion for new trial, it would "kill his appeal." He said that after the Petitioner signed this affidavit, he dismissed the Petitioner's appeal pursuant to the Petitioner's instructions. Appellate counsel asserted that he believed the Petitioner understood the consequences of dismissing his appeal, that the Petitioner made the decision to dismiss his appeal voluntarily, and that he had never forced or asked the Petitioner to dismiss his appeal. He said that the Petitioner's February 6, 2019 letter came "out of the blue" and that he discussed this issue with the Petitioner to ensure he "understood what he was doing" before having the Petitioner sign the affidavit. Appellate counsel said he attached the Petitioner's February 6, 2019 letter to the motion to dismiss he filed on February 12, 2019, and that he filed the Petitioner's affidavit on February 13, 2019.

The proof presented at the post-conviction hearing overwhelmingly shows that the Petitioner instructed appellate counsel to dismiss his appeal and that appellate counsel fully discussed this issue with the Petitioner before following the Petitioner's instructions and dismissing his appeal. Moreover, the sentencing transcript shows that the Petitioner's sentence was the result of an agreement between the parties, which was approved by the trial court, and that the Petitioner was specifically informed that his sentences of imprisonment in Count 1 and Count 2 would be served at one hundred percent and would be served consecutively by law. Because the Petitioner has failed to show that appellate counsel provided ineffective assistance in failing to discuss his sentencing or in dismissing his appeal, he is not entitled to relief on this issue.

II. **Sentence is Unconstitutional.** The Petitioner also contends that his sentence on the marijuana charge violates the prohibition against cruel and unusual punishment in both the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution, "particularly following the change in law after his trial with respect to drugs in a school zone." He claims that because Code section 39-17-432 has been amended "to not only reduce the distance to 500 [feet of a school] but also to remove the mandatory service of the minimum sentence," there is a "rebuttable resumption" in his favor. See Tenn. Code Ann. § 39-17-432 (2020). The Petitioner, referencing Montgomery v. Louisiana, 577 U.S. 190, 200 (2016), and Schriro v. Summerlin, 542 U.S. 348, 353 (2004), asserts that because Code section 39-17-432 "now alters the range of conduct and the class of persons that the law punishes[,]" the amended version of Code section 39-17-432 "should be applied retroactively." He claims that "the sentencing enhancement contained in Tenn. Code Ann. § 39-17-432 (2014) was arbitrarily used in [his] case, despite it being disproportionate to the crime committed." The Petitioner asserts that there was "[n]o evidence . . . demonstrating that [he] was in the school zone to sell drugs or [to] otherwise expose vulnerable persons [to drugs]" and that "it was undisputed at trial that [he] was simply traveling through the school zone with marijuana in his vehicle when he was pulled over for speeding[;]" accordingly, he maintains that "[u]nder the current statutory scheme, he would not have received such a severe sentence." Lastly, the Petitioner claims, although this is totally at odds with his trial transcript, that an officer testified at his trial that the location of his traffic stop was over 500 feet from the school, which places his offense "outside the current Drug Free School Zone Act." In response, the State contends that based on the application of the Drug-Free School Zone Act as it existed at the time of the Petitioner's offense, conviction, and sentencing, the Petitioner is not entitled to relief. We conclude that the sentencing provisions of Code section 39-17-432 that were in effect at the time of the Petitioner's offense did not violate the prohibitions against cruel and usual punishment. We also conclude that the amendment to Code section § 39-17-432 does not amount to a "new rule" requiring retroactive application. Accordingly, the Petitioner is not entitled to relief.

The record shows that the Petitioner committed the offense of possession of marijuana with the intent to sell or deliver within a school zone on March 9, 2016. He was convicted on February 28, 2017, and sentenced on June 18, 2018. Then, more than two years after the Petitioner was sentenced and more than four years after the Petitioner committed the relevant offense, the Tennessee General Assembly amended the Drug-Free School Zone Act, which became effective on September 1, 2020. See Act of July 15, 2020, ch. 803, §§ 1-9 (S.B. 2734) (effective Sept. 1, 2020) (codified as amended at Tenn. Code Ann. § 39-17-432 (2020)). The General Assembly specifically provided that this amended act applied to offenses "committed on or after" September 1, 2020. See id.

The version of the Drug-Free School Zone Act that was in effect at the time of the Petitioner's offense, provided the following, in pertinent part:

(b)(1) A violation of § 39-17-417 . . . that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

. . . .

(c) Notwithstanding any other law or the sentence imposed by the court to the contrary, a defendant sentenced for a violation of subsection (b) shall be required to serve at least the minimum sentence for the defendant's appropriate range of sentence. Any sentence reduction credits the defendant may be eligible for or earn shall not operate to permit or allow the release of the defendant prior to full service of the minimum sentence.

Tenn. Code Ann. § 39-17-432(b)(1), (c) (2014) (amended in 2020).

The 2020 amended statute, which gave the court greater discretion to apply the sentencing enhancement and reduced the distance triggering the enhancement from 1000 feet to 500 feet of a school's real property, provides, in pertinent part:

(b)(1) A violation of § 39-17-417 . . . may be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) if the violation . . . occurs:

(A) On the grounds or facilities of any school; or

- 21 -

(B) Within <u>five hundred feet (500')</u> of or within the area bounded by a divided federal highway, whichever is less, the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, public library, recreational center, or park.

. . . .

(c)(1) Notwithstanding any other law or the sentence imposed by the court to the contrary, a defendant sentenced for a violation of subsection (b) <u>may be required to serve at least the minimum sentence for the defendant's appropriate range of sentence.</u>

(2) There is a <u>rebuttable presumption</u> that a defendant is not required to serve at least the minimum sentence for the defendant's appropriate range of sentence. The rebuttable presumption is overcome if the court finds that the defendant's conduct exposed vulnerable persons to the distractions and dangers that are incident to the occurrence of illegal drug activity.

(3) If the defendant is required to serve at least the minimum sentence for the defendant's appropriate range of sentence, any sentence reduction credits the defendant may be eligible for or earn must not operate to permit or allow the release of the defendant prior to full service of the minimum sentence.

<u>Id.</u> § 39-17-432(b)(1), (c) (2020) (emphases added).

As an initial matter, we note that this court has repeatedly held that the sentencing provisions of the Drug-Free School Zone Act, under which the Petitioner was sentenced, do not violate the constitutional prohibitions against cruel and unusual punishment. <u>State v. Smith</u>, 48 S.W.3d 159, 173 (Tenn. Crim. App. 2000); <u>State v. Jenkins</u>, 15 S.W.3d 914, 919-20 (Tenn. Crim. App. 1999); <u>State v. Jordan Thomas Peters</u>, No. E2014-02322-CCA-R3-CD, 2015 WL 6768615, at *11 (Tenn. Crim. App. Nov. 5, 2015); <u>State v. Steve Duclair</u>, No. E2012-02580-CCA-R3-CD, 2014 WL 1663152, at *11 (Tenn. Crim. App. Apr. 23, 2014).

We also reject the Petitioner's claim that the 2020 amendment to the Drug-Free School Zone Act somehow constitutes a "new rule" that applies retroactively to his sentence. In order to properly analyze this issue, we must consider federal and state precedent regarding the retroactive application of a "new rule." While new constitutional rules of criminal procedure announced in United States Supreme Court decisions generally do not apply retroactively to cases on collateral review, new substantive rules announced

in such decisions do apply retroactively. Teague v. Lane, 489 U.S. 288, 310 (1989); Schriro, 542 U.S. at 351; Welch v. United States, 578 U.S. 120, 128 (2016). Substantive rules alter "the range of conduct or the class of persons that the law punishes." Schriro, 542 U.S. at 353. On the other hand, procedural rules "regulate only the manner of determining the defendant's culpability[.]" Id. When a new substantive rule of federal constitutional law dictates the outcome in a case, the United States Constitution requires state collateral review courts to give retroactive effect to that rule under the Teague framework. Montgomery, 577 U.S. at 200. "[A] court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced." Id. at 203.

As for new constitutional rules announced in state appellate decisions, the Tennessee Supreme Court held that Tennessee Code Annotated section 40-30-122 of the Post-Conviction Procedure Act governs the retroactive effect of new constitutional rules announced in state appellate decisions for post-conviction petitioners. Bush v. State, 428 S.W.3d 1, 16 (2014); see Tenn. Code Ann. § 40-30-122 ("A new rule of constitutional criminal law shall not be applied retroactively in a post-conviction proceeding unless the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or requires the observance of fairness safeguards that are implicit in the concept of ordered liberty."). The Bush court concluded that "by adopting Tenn. Code Ann. § 40-30-122, the General Assembly intended to replace the retroactivity standard this Court adopted in Meadows v. State with the functional equivalent of the federal standard from Teague v. Lane[.]" Bush, 428 S.W.3d at 20.

Despite the Petitioner's claims to the contrary, the 2020 amendment to the Drug-Free School Zone Act did not create a "new rule" entitled to retroactive effect. While the 2020 amendment undoubtedly made some changes to Code section 39-17-432, these changes were not the result of a judicial decision on an existing statutory provision. Schriro v. Summerlin clarified that judicial decisions result in "new rules" for retroactive application:

> When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L.Ed.2d 649 (1987). As to convictions that are already final, however, the rule applies only in limited circumstances. New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see Bousley v. United States, 523 U.S. 614, 620-621, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see Saffle v. Parks, 494 U.S. 484, 494-495, 110 S. Ct. 1257, 108 L. Ed. 2d

415 (1990); Teague v. Lane, 489 U.S. 288, 311, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion).

542 U.S. at 351-52 (emphasis added) (footnote omitted); see State v. Ariel Ben Sherman, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032, at *3 (Tenn. Crim. App. July 12, 2007), aff'd, 266 S.W.3d 395 (Tenn. 2008) (recognizing that "Schriro addressed the impact of a judicial decision on existing statutory provisions for judge-sentencing; it did not involve the amendment of statutory provisions") (concluding that Schriro did not afford the defendants the benefit of the General Assembly's post-offense narrowing of the scope of the child neglect statute).

In this case, the Petitioner has failed to identify, and this court has been unable to find, any decision by the United States Supreme Court or by a Tennessee appellate court that resulted in a "new rule" that requires retroactive application of the 2020 amendment to the Drug-Free School Zone Act. Here, the General Assembly's 2020 amendment, which provided the sentencing court with greater discretion to apply the enhancement and reduced the distance triggering the enhancement from 1000 feet to 500 feet of a school's real property, simply does not constitute a "new rule" that must be applied retroactively. In fact, the General Assembly specifically stated that the 2020 amendment was to apply to offenses "committed on or after" September 1, 2020. For these reasons, the Petitioner is not entitled to relief.

**III. Sentence is Illegal under Rule 36.1.** Regarding this issue, the Petitioner's appellate brief states, "Petitioner filed, pro se, a Motion to Correct Illegal Sentence" and "[t]hat argument is incorporated herein, as counsel seeks to ensure this issue is preserved[.]" The brief then asserts that the Petitioner's Rule 36.1 motion, which was attached to the brief, "was based largely upon the change in the Drug Free School Zone Act under Tenn. Code. Ann. § 39-17-432[, which was argued in the previous section]" and "[t]hat argument is incorporated herein as if repeated fully herein." The State responds that because the Petitioner's sentence for possession of marijuana with the intent to sell within a Drug-Free School Zone adheres to the applicable law, it is not illegal. We conclude that the Petitioner has waived this issue and that waiver notwithstanding, he is not entitled to relief.

Initially, we recognize that the Petitioner provided no argument, no citations to authorities, and no references to the record for this issue in his brief, and we conclude that post-conviction counsel's mere attachment of the Petitioner's pro se motion to the brief is woefully insufficient to satisfy these requirements. Accordingly, this issue is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth

. . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]"). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)). Waiver notwithstanding, we conclude that the Petitioner is not entitled to relief.

Rule 36.1 allows a defendant or the State to seek the correction of an unexpired illegal sentence. See Tenn. R. Crim. P. 36.1(a)(1); State v. Brown, 479 S.W.3d 200, 211 (Tenn. 2015). For the purposes of Rule 36.1, "an illegal sentence is one that is not authorized by the applicable statutes or that directly contravenes an applicable statute." Tenn. R. Crim. P. 36.1(a)(2). "Sentencing errors fall into three categories—clerical errors, appealable errors, and fatal errors[,]" and "[o]nly fatal errors render sentences illegal." State v. Wooden, 478 S.W.3d 585, 595 (Tenn. 2015) (citing Cantrell v. Easterling, 346 S.W.3d 445, 448-49 (Tenn. 2011)). Examples of illegal sentences include:

> (1) a sentence imposed pursuant to an inapplicable statutory scheme; (2) a sentence designating a RED [Release Eligibility Date] where a RED is specifically prohibited by statute; (3) a sentence ordered to be served concurrently where statutorily required to be served consecutively; and (4) a sentence not authorized for the offense by any statute.

Davis v. State, 313 S.W.3d 751, 759 (Tenn. 2010) (citations omitted).

To avoid summary denial of an illegal sentence claim brought under Rule 36.1, the defendant must establish a colorable claim that the sentence is illegal. Tenn. R. Crim. P. 36.1(b)(2). For the purposes of Rule 36.1, a colorable claim is "a claim that, if taken as true and viewed in a light most favorable to the moving party, would entitle the moving party to relief under Rule 36.1." Wooden, 478 S.W.3d at 593. The determination of whether a Rule 36.1 motion states a colorable claim is a question of law, which this court reviews de novo. Id. at 589 (citing Summers v. State, 212 S.W.3d 251, 255 (Tenn. 2007)). The determination of whether a sentence is illegal is also a question of law, which this court reviews de novo. State v. Dusty Ross Binkley, No. M2014-01173-CCA-R3-CD, 2015 WL 2148950, at *2 (Tenn. Crim. App. May 7, 2015) (citing Summers, 212 S.W.3d at 255).

Although the Petitioner appears to argue that his sentence is illegal because of the subsequent amendment to the Drug-Free School Zone Act, the Petitioner's sentence was authorized by the applicable law. The Petitioner committed the relevant offense on March 9, 2016. The Petitioner was sentenced, by agreement of the parties, to two years at one hundred percent for his conviction for possession of one-half ounce or more of marijuana

with the intent to sell or deliver within 1000 feet of a school. Code section 39-17-417(g)(1) (2014) provides that possession of half an ounce or more of marijuana is a Class E felony. Pursuant to Code section 39-17-432(b)(1) (2014), as it existed at the time of the Petitioner's offense, the trial court was required to impose a sentence "one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." The sentencing range for a Range I offender convicted of a Class D felony is "not less than two (2) nor more than four (4) years[.]" Tenn. Code Ann. § 40-35-112(a)(4) (2014). Accordingly, the Petitioner's sentence was authorized by the applicable statutes. To the extent that the Petitioner is claiming his sentence is illegal under Rule 36.1 because it violates the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution, we note that "[c]hallenges to the constitutionality and interpretation of sentencing statutes are not cognizable claims for relief under Rule 36.1." State v. Jermaine Carpenter, No. E2016-00450-CCA-R3-CD, 2016 WL 5416350, at *3 (Tenn. Crim. App. Sept. 28, 2016). Here, the Petitioner's sentence was clearly authorized by the applicable statutes and did not contravene an applicable statute. See Tenn. R. Crim. P. 36.1(a)(2). Because the Petitioner's sentence does not constitute an illegal sentence under Rule 36.1, the Petitioner is not entitled to relief.

## CONCLUSION

Based on the record, the applicable authorities, and the aforementioned analysis, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 26 -